**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| LAMONT HALL, | ) |
| | ) |
| Plaintiff, | ) CIVIL ACTION UNDER §1983 |
| | ) |
| vs. | ) Case No. 14 C 6308 |
| | ) |
| ARTHUR FUNK, M.D., | ) Judge Matthew F. Kennelly |
| WEXFORD HEALTH SOURCES, INC., and | ) |
| MICHAEL LEMKE, | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF LAMONT HALL'S FIRST AMENDED COMPLAINT**

Plaintiff Lamont Hall ("Hall"), by and through his attorneys, files this First Amended

Complaint against defendants Arthur Funk, M.D. ("Funk"), Wexford Health Sources, Inc.

("Wexford"), and Michael Lemke ("Lemke") (collectively, "defendants") as follows:

**INTRODUCTION**

1.      This is a civil action seeking damages against defendants for, *inter alia*,

committing acts, under color of state law, which deprived Mr. Hall of rights secured by the

United States Constitution and the laws of the United States.  Defendants Funk, Wexford, and

Lemke repeatedly acted with deliberate and conscious indifference to Mr. Hall's serious medical

condition, depriving Mr. Hall of his rights guaranteed by the Eighth and Fourteenth Amendments

to the Constitution of the United States.

2.      This action also asserts Illinois common law medical malpractice claims and

seeks damages against defendants Funk and Wexford for negligence in the provision of Mr.

Hall's medical care.  Defendants Funk and Wexford repeatedly failed to conform to the

applicable standard of medical care, causing Mr. Hall significant and unnecessary pain and suffering.

3.　　　This action also asserts claims and seeks damages against defendants Funk and Wexford under the Illinois common law intentional infliction of emotional distress for the extreme and outrageous conduct of refusing to provide Mr. Hall basic and much-needed medical care as additional punishment for a crime. Defendants Funk and Wexford recklessly and consciously disregarded the risk of inflicting emotional distress on Mr. Hall and did in fact inflict emotional distress on Mr. Hall.

## JURISDICTION AND VENUE

4.　　　This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of state law of Mr. Hall's rights as secured by the United States Constitution.

5.　　　This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a).

6.　　　This action also asserts Illinois common law medical malpractice and intentional infliction of emotional distress claims.

7.　　　This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

8.　　　Venue is proper under 28 U.S.C. § 1391(b). Defendants are subject to personal jurisdiction in this judicial district because the individual defendants resides here and the corporate defendant does business here. Moreover, all of the events giving rise to the claims asserted herein occurred within the Northern District of Illinois.

## PARTIES

9.　　　From on or about February 8, 2013, to on or about October 4, 2013, plaintiff Lamont Hall was incarcerated at Stateville Correctional Center ("Stateville"), a prison facility

operated by the Illinois Department of Corrections ("IDOC"). During that time, he required but did not receive timely treatment for a traumatic penis injury and related conditions.

10. Defendant Funk is a physician licensed to practice medicine in Illinois. By counsel's estimation, he has been sued approximately twenty-five times for being deliberately indifferent to prisoners' serious medical needs.[1] At all relevant times, defendant Funk was employed by either defendant Wexford or the IDOC to supervise the provision of medical care at Stateville. In such role, defendant Funk made decisions about what medical care Mr. Hall would receive and treated Mr. Hall directly on at least one occasion. Defendant Funk is not a specialist in either urology or surgical repair of traumatic injuries. Defendant Funk acted under color of state law when performing these duties.

11. Defendant Wexford is a corporation conducting business in the State of Illinois. Defendant Wexford contracted with the State of Illinois to provide medical services, including care for traumatic injuries, to inmates in the custody of IDOC. Defendant Wexford acted under color of state law when performing its contractual duties.

12. During the relevant time period, defendant Lemke was employed by IDOC as the Stateville Warden. As Warden, defendant Lemke retained final discretion on the provision of emergency medical care through the prisoner grievance system and enforced IDOC policies and procedures. Defendant Lemke acted under color of state law when performing these duties.

---

[1] *See, e.g., Diaz v. Hart*, No. 08 C 5621, 2010 WL 849654, at *6 (N.D. Ill. Mar. 8, 2010) (physicians at Cook County Jail and Stateville, including Dr. Funk, "can all be considered to have had sufficient personal involvement with these denials of surgery to allow Diaz's claims to proceed against them in their individual capacities, particularly as their high-level positions warrant an inference that they established policies that others followed in withholding treatment."); *Gills v. Funk*, No. 13-CV-00791-GPM, 2013 WL 4670034, at *1 (S.D. Ill. Aug. 30, 2013) ("[p]laintiff fears that if his ailments go untreated—if he is not give[n] the recommended surgeries—he could die."). *See also King v. Mote*, No. 04-1328, 2007 WL 3348402, at *3 (C.D. Ill. Nov. 5, 2007) ("the plaintiff says Dr. Funk mocked him and accused him of being a malingerer.")

## FACTS

### *The Wound to Plaintiff's Penis*

13.     On or about November 18, 2012, Mr. Hall suffered a gunshot wound to his penis, which created a through-and-through injury, with a diameter of approximately 2 centimeters.

14.     Physicians at Presence Saint Francis Hospital in Evanston, Illinois performed emergency surgery on Mr. Hall immediately following the incident on or about November 18. 2012, and inserted an 18 inch French Foley catheter.

15.     While recovering at Presence Saint Francis Hospital, Mr. Hall was seen by a urologist who recommended and prescribed a treatment plan which included  a second surgery—a staged urethroplasty.   The urethroplasty was needed in order for the wound to heal properly and to restore full function of his penis.  A urethroplasty is a procedure to repair an anatomic defect and to restore normal function to the organ.  Initially, Mr. Hall was advised to follow-up within two weeks.

16.     The physicians at Presence Saint Francis Hospital further advised Mr. Hall that, once they removed the French Foley catheter, he would be able to urinate on his own, but only in a seated position. To fully restore function to his penis and urethra, Mr. Hall would need a staged urethroplasty.  However, until he had the staged urethroplasty, he would need to regularly insert a straight catheter into the opening at the tip of his penis.  Without regular insertion of the straight catheter, structuring could occur, which would make restoring full functioning of Mr. Hall's urethra more difficult and subject to serious complications.

17.     As the urologist and treating physicians at Presence Saint Francis Hospital explained to Mr. Hall,  the straight catheter was  a temporary procedure for use pending Mr. Hall's staged urethroplasty.  If Mr. Hall ceased to routinely insert the straight catheter, he would risk losing the ability to restore a fully functioning urethra.

4

18.    In addition, the urologist and other treating physicians at Presence Saint Francis Hospital gave Mr. Hall specific instructions for caring for his wound, which included cleaning his genital area daily with antibacterial soap and regularly changing his bandages.

19.    Mr. Hall's staged urethroplasty was scheduled to be performed in or around March 2013.

20.    On or about February 5, 2013, Mr. Hall was arrested for home invasion, which put him in violation of his parole and caused him to be incarcerated.  On or about February 8, 2013, after being processed briefly at Cook County Jail, Mr. Hall was sent to Stateville to serve the remainder of a portion of the time left on his original sentence.

21.    On or about March 13, 2013, prison officials calculated that Mr. Hall would be released from Stateville no later than October 4, 2013.

22.    From Mr. Hall's incarceration at Stateville on or about February 8, 2013, to on or about October 4, 2013, defendants shared responsibility to provide and oversee the provision of Mr. Hall's medical care.

### *Scheduling Mr. Hall's Second Urethroplasty*

23.    On or about February 6, 2013, Mr. Hall was seen by a medical professional at the Cook County Jail's Medical Infirmary.  Medical records from that date describe Mr. Hall's wound as a "gaping hole."  Mr. Hall told unnamed medical staff at that time about the wound to his penis and his need for a staged urethroplasty.

24.    At that time, Mr. Hall also had a psychiatric consultation with a physician.  Mr. Hall reported his history of depression and anxiety.  Mr. Hall specifically stated that he had attempted suicide three times in the past.

25.     Cook County Jail sent these medical records to Stateville on or about the time Mr. Hall was transferred into IDOC custody on February 8, 2013.

26.     Immediately upon entering into IDOC's custody, Mr. Hall again informed prison medical personnel of the wound to his penis and his need for a staged urethroplasty, as the urologist at Presence Saint Francis Hospital had advised.

27.     On or about February 8, 2013, Mr. Hall had another psychiatric consultation. He reported feeling symptoms of depression.  He also notified his treating physician of the open wound to his penis and his substantial pain.

28.     On or about February 13, 2013, Mr. Hall had a consultation with Stateville physician's assistant, Diane Schwarz.  At that time, Mr. Hall informed Ms. Schwarz of the wound on his penis, his need to clean the wound daily, his need for straight catheter replacements, and his need for a staged urethroplasty.  He advised Ms. Schwarz that the staged urethroplasty was critical to ensure proper healing, to restore long-term function of his penis, and to enable him to cease using the straight catheter that he had been required to use since his initial surgery.  Ms. Schwarz scheduled him for a follow up appointment the next week.

29.     On or about February 20, 2013, Mr. Hall had a second appointment with Ms. Schwarz.  At that time, Mr. Hall and Ms. Schwarz discussed Mr. Hall's penis injury in more detail.  Ms. Schwarz indicated she would seek approval for an outside consultation with the Urology Department at the University of Illinois at Chicago Medical Center ("UIC Medical Center").  Ms. Schwarz also discussed Mr. Hall's injury with defendant Funk.

30.     One month later, on or about March 20, 2013, Ms. Schwarz secured the approval for a urology consultation at UIC Medical Center after reviewing Mr. Hall's case with a physician employed either by defendant Wexford or the IDOC, Dr. Haymes.  The urology

6

consultation at UIC Medical Center was scheduled for June 2013—three months after Mr. Hall arrived at Stateville and eight months after his initial injury. Throughout this time period, Mr. Hall continued to experience constant, severe pain in his genital areas which affected his daily activities.

31.     Also throughout this period, Mr. Hall continued to insert a straight catheter into his urethra at least 2-3 times a week. He did so without the aid of prescribed numbing gel. Mr. Hall experienced intense pain with every insertion.

32.     On or about June 12, 2013, over four months after entering Stateville, Mr. Hall finally received his first urological consultation at UIC Medical Center. The urological specialist who examined Mr. Hall noted that Mr. Hall "[n]eeds surgical repair" and also stated that he would "schedule [the surgery] through Pat." The urological specialist made clear that Mr. Hall needed "[d]aily showers to prevent infection" and that Mr. Hall should return for a second consultation in "1 month" (emphasis in original).

33.     On that same day, when Mr. Hall returned to Stateville, he saw defendant Funk to review the UIC specialist's orders and recommendations. Defendant Funk made clear that he would not follow the urological specialists' orders and recommendations. He checked a box marked "Deny" and noted "repair is elective, daily showers not necessary."

34.     Defendant Funk did more than deny the urological specialist's recommendations and orders. He told Mr. Hall that he did not need the surgery because "it'd grow back," apparently referring to Mr. Hall's penis. Defendant Funk also denied the urologist's prescription for daily showers, stating to Mr. Hall "that's why you have a sink."

35.     On or about July 16, 2013, defendant Funk officially denied Mr. Hall's urethroplasty, which had been recommended by urologists at both Presence Saint Francis

Hospital and UIC Medical Center. At the same time, defendant Funk recorded that Mr. Hall would continue to "self-cath." Upon information and belief, defendant Funk did not inform Mr. Hall or the urologists at the UIC Medical Center that he had denied approval for his staged-urethroplasty.

36. On or about July 23, 2013, Stateville conducted a evaluation of Mr. Hall's suicidal tendencies. In that evaluation, it was observed that Mr. Hall was expressing feelings of hopelessness or helplessness, that he was showing signs of depression, and that he had made previous suicide attempts.

37. Approximately six months after entering the custody of Stateville, on or about August 7, 2013, Mr. Hall had a second consultation with a urological surgeon at UIC Medical Center. Based on the importance of the surgery, the urological surgeon scheduled Mr. Hall's surgery for September 12, 2013 and gave certain pre-operative orders, including that Mr. Hall receive a pre-operative shower with antiseptic soap the day before the surgery.

38. On or about September 12, 2013, Mr. Hall was called down to inmate processing in order to be transported to UIC Medical Center to receive his long-awaited staged urethroplasty.

39. However, after waiting for several hours in the inmate processing cell, Mr. Hall was informed that his surgery had been cancelled. Ms. Schwarz informed Mr. Hall that defendant Funk had cancelled the surgery. Ms. Schwarz also stated that that she did not know why defendant Funk had canceled the surgery. Based the information provided by Ms. Schwarz and the actual failure to receive the urethroplasty, Mr. Hall filed an emergency grievance.

40. Throughout his entire duration at Stateville and during all relevant times, defendants Funk and Wexford showed deliberate indifference to Mr. Hall's serious medical

needs in refusing to permit Mr. Hall to receive his staged urethroplasty to repair the open wound to his penis and to restore full function of his penis, as urological specialists at Presence Saint Francis Hospital and UIC Medical Center had recommended. Defendant Lemke condoned such deliberate indifference and took no actions to correct it.

41.     As a result, throughout his incarceration at Stateville and during all relevant times, Mr. Hall endured extreme and unnecessary pain and related emotional suffering. Until he received his staged urethroplasty, he had to insert his own catheter on a regular basis, without proper replacements or numbing gel; faced ridicule and harassment from fellow inmates in showers and restrooms; constantly feared infection and permanent disability or disfigurement of his penis; and experienced heightened symptoms of depression and anxiety.

42.     At all times, defendants had knowledge of Mr. Hall's depression as well as his "gaping wound" in his penis. Yet, instead of following the recommendations of urologists, defendants failed to secure Mr. Hall his needed urethroplasty and instead insisted that he continue a treatment plan in which he endured extreme, intense, and unnecessary pain by inserting a straight catheter into his urethra 2 to 3 times a week.

*Failing to Provide Mr. Hall with Access to Soap and Daily Showers*

43.     Immediately upon entering into IDOC's custody, Mr. Hall informed prison medical personnel of his need to properly clean the wound on his penis as well as to insert a straight catheter daily, as the physicians at Presence Saint Francis Hospital had advised.

44.     Throughout his incarceration at Stateville, Mr. Hall repeatedly requested additional soap and permission to shower more than once per week in order to clean his wound adequately. Mr. Hall made these requests both directly to medical personnel and prison officials, and through the prisoner grievance system. In essence, Mr. Hall requested that defendants

follow the basic recommendations of the specialists at Presence Saint Francis Hospital and UIC Medical Center.

45.     Defendants repeatedly denied these requests.  Instead, they provided Mr. Hall with soap only on a monthly basis and permitted Mr. Hall to shower only on a weekly basis. They also reduced his medical supplies, providing Mr. Hall with only enough straight catheters to perform the painful, but necessary straight catheter procedure on an ad hoc basis.

46.     After Mr. Hall's June 12, 2013 surgery consultation, the UIC urologist ordered that Mr. Hall be allowed to take daily showers in order to properly care for the open wound to his penis.

47.     Despite knowing about the Mr. Hall's prescription for daily showers, defendants refused to allow Mr. Hall daily access to showers and continued to allow Mr. Hall to shower only once a week.  In fact, when Mr. Hall returned from his June 12, 2013 surgery consultation, he had an appointment with defendant Funk.   Defendant Funk acknowledged receipt of the urological surgeon's order, but told Mr. Hall that he would not be getting daily showers because "that's why you have a sink."

48.     Finally, on or about August 23, 2013, Mr. Hall was granted a special needs permit to shower three times per week—still not nearly what the specialist at UIC Medical Center had ordered.  Yet grievances that Mr. Hall filed in September of 2013 make clear that, despite the special needs permit, Mr. Hall still was not permitted to shower more than once per week.

49.     Throughout Mr. Hall's incarceration at Stateville and during all relevant times, defendants showed deliberate indifference to Mr. Hall's serious medical need and refused to provide him soap and permission to shower daily in order to care for the open wound on his penis, as was ordered by physicians at Presence Saint Francis Hospital and UIC Medical Center.

50.     As a result, throughout Mr. Hall's incarceration at Stateville and during all relevant times, Mr. Hall endured extreme and unnecessary, physical and emotional, pain and suffering.  Because he could not wash the area around his wound adequately, he constantly feared infection and permanent disability or disfigurement of his penis; faced ridicule and harassment from fellow inmates in showers and restrooms; and experienced heightened symptoms of depression and anxiety.

### *Failing to Respond to Mr. Hall's Grievances, Including His Emergency Grievance*

51.     Upon information and belief, Mr. Hall filed several grievances throughout his duration at Stateville, alerting medical and prison personnel to the insufficient medical care that he was receiving.  These grievances[2] addressed Mr. Hall's inability to see medical personnel regarding his serious medical condition as well as being denied access to shower daily, as was prescribed by specialists at UIC Medical Center.  Defendants did not adequately address these grievances.

52.     In particular, defendants did not adequately address at least three emergency medical grievances.  Pursuant to Ill. Admin. Code 504.840, when an inmate requests that a grievance be handled on an emergency basis, "[t]he Chief Administrative Officer shall expedite processing of the grievance and respond to the offender, indicating what action shall be or has been taken."  In other words, the warden of the prison—defendant Lemke, in this case—was responsible for reviewing Mr. Hall's emergency medical grievance on an expedited basis and informing Mr. Hall of the outcome of that emergency medical grievance.

---

[2] As of the filing of this amended complaint, IDOC has not provided counsel copies of any of the grievances Mr. Hall filed, despite counsel's request for such records in a subpoena originally dated January 14, 2015.   Counsel renewed the request for these grievances on April 2, 2015.

53.     On or about May 29, 2013, Mr. Hall filed an emergency medical grievance requesting to see a physician and to be permitted to shower more than once weekly.  In response, on or about June 6, 2013, Mr. Hall's counselor noted, "[y]our original grievance has been forwarded to the grievance office to await response from the HCU.  At which time you will receive a copy of same."  Mr. Hall never received a response from the Health Care Unit.

54.     On or about September 6, 2013, Mr. Hall filed an emergency medical grievance requesting that he be permitted to have his staged urethroplasty.  Mr. Hall either did not know that the surgery had been scheduled for September 12, 2013, or at least rightly suspected that defendants Funk and Wexford were "trying to wait until [he was] released from their custody."  Mr. Hall never received a response to that emergency medical grievance.

55.     Shortly after Mr. Hall's scheduled urethroplasty was cancelled without explanation on September 12, 2013, Mr. Hall again filed an emergency medical grievance requesting that he be permitted to have his staged urethroplasty and to shower more than once per week.  Mr. Hall also never received a response to that emergency medical grievance.

56.     Defendant Lemke never informed Mr. Hall of the outcome of the emergency medical grievances that Mr. Hall filed on or about May 29, 2013, September 6, 2013, and September 12, 2013.  To the contrary, instead of reviewing Mr. Hall's emergency medical grievances on an expedited basis and informing Mr. Hall of the outcomes, defendant Lemke completely ignored the emergency medical grievances from the time they were made until Mr. Hall was transferred into the custody of the Cook County Department of Corrections on or about October 4, 2013.

57.     Throughout his entire duration at Stateville and during all relevant times, defendants showed deliberate indifference to Mr. Hall's serious medical needs in that they failed to adequately respond to his grievances, including at least three emergency medical grievances.

58.     As a result, throughout Mr. Hall's incarceration at Stateville and during all relevant times, Mr. Hall endured extreme and unnecessary, physical and emotional, pain and suffering.  The failure to respond to his grievances exacerbated the other deficiencies in his medical care—namely, that he had to insert his own catheter on a regular basis, without proper replacements and numbing gel; faced ridicule and harassment from fellow inmates in showers and restrooms; constantly feared infection and permanent disability or disfigurement of his penis; and experienced heightened symptoms of depression and anxiety.

### *Causation*

59.     Due to defendants' failure to provide Mr. Hall proper care for the open wound on his penis, including but not limited to failing to provide Mr. Hall with the urologist recommended staged urethroplasty as well as daily showers, Mr. Hall suffered tremendous pain as well as the disability and disfigurement of his genitals. In particular, until he received his urethroplasty, Mr. Hall was forced to insert his own catheters, without proper supplies and necessary numbing gel; suffered ridicule from fellow inmates; ran the risk of serious infection; and suffered from the heightened symptoms of depression and anxiety.  Despite now having received the surgery, Mr. Hall cannot achieve a physical erection on his own and continues to suffer from depression and anxiety.

60.     Thus, as a result of defendants' conduct, Mr. Hall suffered extreme emotional and physical pain; the related inability to focus on everyday functions, such as reading, writing, or

working; the temporary loss of normal functioning of his penis, including both urinary and

sexual functions; related emotional pain and suffering; and other serious health consequences.

61.     Physicians must have their patients' best interests in mind when making medical

decisions.  Mr. Hall had an open wound in his penis that required him to urinate in such a way

that was embarrassing and psychologically harmful.  This, combined with Mr. Hall's underlying

psychological diagnosis of depression and past suicide attempts, compelled defendants to follow

the recommendations of the independent urologists and schedule Mr. Hall's urethroplasty as

soon as medically possible.

### COUNT I – EIGHTH AMENDMENT VIOLATIONS
### DEFENDANT ARTHUR FUNK

62.     Mr. Hall restates and incorporates by reference the allegations of Paragraphs 1

through 61 herein.

63.     Mr. Hall brings Count I against defendant Funk in his individual and official

capacities.

64.     Mr. Hall suffered from a serious medical need while at Stateville in that he had an

open wound on his penis that caused him extreme pain, suffering, loss of function,  and other

adverse health effects.

65.     Upon information and belief, defendant Funk was responsible for supervising the

provision of all medical services, including care for traumatic injuries, at Stateville.  In this role,

defendant Funk directly determined the extent of the care Mr. Hall received for the open wound

on his penis, and in addition, treated Mr. Hall directly on at least one occasion.  Defendant Funk

acted under color of state law when he performed these duties.

66.     Defendant Funk knew, or reasonably should have known, that Mr. Hall's open

wound was a serious medical condition requiring treatment.  Mr. Hall informed medical

personnel immediately upon arriving at Stateville of the serious nature of his injury as well as his pre-existing mental health conditions; Ms. Schwarz noted that she discussed Mr. Hall's injury with defendant Funk on or about February 20, 2013; and Mr. Hall discussed the injury directly with defendant Funk on or about June 12, 2013, when defendant Funk checked Mr. Hall back into Statesville after his urological consultation at UIC Medical Center.

67. However, despite defendant Funk's awareness, he was deliberately indifferent to Mr. Hall's serious medical needs. In particular, defendant Funk:

   a. Refused to permit Mr. Hall to shower regularly with sufficient soap, as was prescribed by independent medical professionals;

   b. Failed to adequately respond to Mr. Hall's requests and grievances for medical care; and

   c. Delayed and ultimately cancelled Mr. Hall's long-awaited staged urethroplasty, which was critical to ensure that the wound healed properly and to restore full function to his penis, without reason or notice.

68. As a result of defendant Funk's conduct, Mr. Hall endured prolonged pain and suffering, and prolonged injury to his penis in violation of his Eighth Amendment rights. More specifically, Mr. Hall suffered extreme emotional and physical distress; the related inability to focus on everyday functions, such as reading, writing, or working; the temporary loss of normal functioning of his penis, including both urinary and sexual functions; related emotional pain and suffering; and other serious health consequences.

69. In short, defendant Funk's conduct constituted deliberate indifference to and reckless disregard of Mr. Hall's serious medical needs and caused Mr. Hall to suffer unnecessary physical injuries and pain and suffering in violation of his Eighth Amendment rights.

## COUNT II – MALPRACTICE
## <u>DEFENDANT ARTHUR FUNK</u>

70.     Mr. Hall restates and incorporates by reference the allegations of Paragraphs 1 through 69 herein.

71.     Mr. Hall brings Count II against defendant Funk in his individual capacity.

72.     The above described conduct of defendant Funk failed to conform to the applicable standard of care in the medical community.  In particular, defendant Funk:

      a.     Refused to permit Mr. Hall to shower regularly with sufficient soap, as was prescribed by independent medical professionals;

      b.     Failed to adequately respond to Mr. Hall's requests and grievances for medical care; and

      c.     Delayed and ultimately cancelled Mr. Hall's long-awaited staged urethroplasty, which was critical to ensure that the wound healed properly and to restore full function to his penis, without reason or notice.

73.     The report of Dr. Benjamin James affirms that defendant Funk's conduct did not meet the appropriate standard of care in the medical community and is attached hereto as Exhibit 1.

74.     As an actual and proximate result of defendant Funk's failure to conform to the applicable standard of care in the medical community, Mr. Hall endured prolonged pain and suffering, and prolonged injury to his penis.  More specifically, Mr. Hall suffered extreme and unnecessary emotional and physical pain; the related inability to focus on everyday functions, such as reading, writing, or working; the temporary loss of normal functioning of his penis, including both urinary and sexual functions; additional and related emotional pain and suffering; and other serious health consequences.

## COUNT III – EIGHTH AMENDMENT VIOLATIONS
## WEXFORD HEALTH SOURCES, INC.

75.     Mr. Hall restates and incorporates by reference the allegations of Paragraphs 1 through 74 herein.

76.     Mr. Hall suffered from a serious medical need while at Stateville in that he had an open wound on his penis that caused him extreme pain, suffering, temporary loss of function, and other adverse health effects.

77.     At all relevant times, under its contract with the IDOC, defendant Wexford was responsible for maintaining official policies and customs to ensure the adequate provision of medical services, including care for traumatic injuries, at Stateville.  Defendant Wexford acted under color of law when it performed this duty.

78.     Instead, defendant Wexford maintained official policies and actual practices that were deliberately indifferent to inmates' serious medical needs.  In particular, Wexford:

a.     Routinely refused to follow the orders and recommendations of outside physicians;

b.     Routinely delayed or cancelled inmates' scheduled appointments with medical professionals, often without explanation;

c.     Routinely delayed responding to medical grievances; and,

d.     Routinely delayed or denied important medical procedures.

79.     Defendant Wexford's policies and practices were so prevalent as to have the force of law.

80.     As a result of defendant Wexford's policies and practices, Mr. Hall endured prolonged pain and suffering, and prolonged injury to his penis in violation of his Eighth Amendment rights.  More specifically, Mr. Hall suffered extreme emotional and physical pain;

the related inability to focus on everyday functions, such as reading, writing, or working; the temporary loss of normal functioning of his penis, including both urinary and sexual functions; related emotional pain and suffering; and other serious health consequences.

81.     In short, defendant Wexford's policies and practices constituted deliberate indifference to and reckless disregard of Mr. Hall's serious medical needs and caused Mr. Hall to suffer physical injuries and pain and suffering in violation of Mr. Hall's Eighth Amendment rights.

## COUNT IV – MALPRACTICE
## WEXFORD HEALTH SOURCES, INC.

82.     Mr. Hall restates and incorporates by reference the allegations of Paragraphs 1 through 81 herein.

83.     Mr. Hall brings Count IV against defendant Wexford under a theory of respondeat superior.

84.     Defendant Funk is an employee or agent of defendant Wexford.  As such, defendant Wexford, a corporation, acted through defendant Funk.

85.     The above described conduct of defendant Funk and other employees or agents of defendant Wexford failed to conform to the applicable standard of care in the medical community.  In particular, employees or agents of defendant Wexford:

> a.     Refused to permit Mr. Hall to shower regularly with sufficient soap, as was prescribed by independent medical professionals;

> b.     Failed to adequately respond to Mr. Hall's requests and grievances for medical care; and

c. Delayed and ultimately cancelled Mr. Hall's long-awaited staged urethroplasty, which was critical to ensure that the wound healed properly and to restore full function to his penis, without reason or notice.

86. The provision of medical care was within the scope of such employees' or agents' employment with defendant Wexford.

87. The report of Dr. Benjamin James affirms that the conduct of Wexford's employee, defendant Funk, did not meet the appropriate standard of care in the medical community and is attached hereto as Exhibit 1.

88. As an actual and proximate result of defendant Wexford's failure to conform to the applicable standard of care in the medical community, Mr. Hall endured prolonged pain and suffering, and prolonged injury to his penis. More specifically, Mr. Hall suffered significant emotional and physical pain and suffering; the related inability to focus on everyday functions, such as reading, writing, or working; the temporary loss of normal functioning of his penis, including both urinary and sexual functions; related emotional pain and suffering; and other serious health consequences.

**COUNT V – ILLINOIS INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**DEFENDANTS ARTHUR FUNK AND WEXFORD HEALTH SOURCES, INC.**

89. Mr. Hall restates and incorporates by reference the allegations of Paragraphs 1 through 88 herein.

90. The above described conduct of defendants Funk and Wexford was extreme and outrageous. In particular, defendants Funk and Wexford:

a. Refused to permit Mr. Hall to shower daily, as a specialist at UIC Medical Center had ordered;

19

b.      Delayed and ultimately cancelled Mr. Hall's long-awaited staged urethroplasty, which was critical to ensure that the wound healed properly and to restore full function to his penis, without reason or notice;

c.      Unnecessarily made Mr. Hall continue a treatment plan which involved him routinely having to insert a straight catheter into his urethra without numbing gel;

d.      Taunted Mr. Hall when refusing to permit Mr. Hall to shower daily and delaying his long-awaited second urethroplasty; and,

e.      Failed to adequately respond to Mr. Hall's requests and grievances for medical care.

91.    Defendants intended their conduct to cause severe emotional distress to Mr. Hall, or at least recklessly and consciously disregarded the high probability that their conduct would cause Mr. Hall severe emotional distress.

92.    As an actual and proximate result of the extreme and outrageous conduct of defendants Funk and Wexford, Mr. Hall endured prolonged emotional pain and suffering.  More specifically, Mr. Hall experienced increased symptoms of depression and anxiety, was subjected to extreme ridicule, and suffered from other serious mental health issues.

### COUNT VI – EIGHTH AMENDMENT VIOLATIONS
### <u>WARDEN MICHAEL LEMKE</u>

93.    Mr. Hall restates and incorporates by reference the allegations of Paragraphs 1 through 92 herein.

94.    Mr. Hall brings Count VI against defendant Lemke in his individual capacity.

95.     Mr. Hall suffered from a serious medical need while at Stateville in that he had an open wound on his penis that caused him extreme pain, suffering, loss of function,  and other adverse health effects.

96.     At all relevant times, defendant Lemke, as the Warden or Chief Administrative Officer at Stateville, was responsible for overall operation of the prison, including the provision of medical care to inmates.  Defendant Lemke had duties to ensure that constitutionally adequate care was provided to inmates and to remediate constitutionally inadequate care to the extent he was aware of it.  Defendant Lemke was also specifically responsible for, and indeed retained final discretion in, responding to emergency medical grievances.  Defendant Lemke acted under color of law when he performed these duties.

97.     Defendant Lemke knew, or reasonably should have known, that Mr. Hall's open wound was a serious medical condition requiring treatment.  Mr. Hall informed medical personnel immediately upon arriving at Stateville of the serious nature of his injury.  Further, Mr. Hall had made repeated requests for medical supplies and medical care through medical and prison personnel that defendant Lemke supervised and through the prisoner grievance system. Finally, Mr. Hall filed an emergency grievance relating to the wound on his penis on or about September 12, 2013, to which it was defendant Lemke's responsibility to respond.

98.     Despite defendant Lemke's awareness, defendant Lemke was deliberately indifferent to Mr. Hall's serious medical needs.  In particular, defendant Lemke failed to respond to Mr. Hall's emergency medical grievances filed on or about May 29, 2013, September 6, 2013, and September 12, 2013.

99.     As a result of defendant Lemke's conduct, Mr. Hall endured prolonged pain and suffering, and prolonged injury to his penis in violation of his Eighth Amendment rights.  More

21

specifically, Mr. Hall suffered extreme emotional and physical pain; the related inability to focus on everyday functions, such as reading, writing, or working; the temporary loss of normal functioning of his penis, including both urinary and sexual functions; related emotional pain and suffering; and other serious health consequences.

100.     In short, defendant Lemke's conduct and constituted deliberate indifference to and reckless disregard of Mr. Hall's serious medical needs and caused Mr. Hall to suffer physical injuries and pain and suffering in violation of his Eighth Amendment rights.


WHEREFORE, Plaintiff Lamont Hall demands judgment against defendants with interest for actual and consequential damages; punitive and exemplary damages; attorneys' fees, interest and costs, which are still accruing; and any other relief deemed by the trier of fact to be just, fair, and appropriate.

Dated: April 17, 2015                                      Respectfully submitted,

LAMONT HALL


By: /s/ Jack R. Bierig_____
      One of His Attorneys


      Jack R. Bierig
      jbierig@sidley.com
      Veena K. Gursahani
      vgursahani@sidley.com
      John Ori Leahy
      jleahy@sidley.com
      SIDLEY AUSTIN LLP
      One South Dearborn
      Chicago, IL 60603
      (312) 853-7000
      (312) 853-7036 (fax)

## CERTIFICATE OF SERVICE

The undersigned certifies that on April 17, 2015, he served the foregoing **First Amended Complaint,** on all counsel of record for defendant Arthur Funk via the Court's ECF filing system.  As to defendant Wexford Health Sources, Inc. and defendant Lemke, the undersigned certifies that summonses will be presented to the clerk pursuant to Fed. R. Civ. P. 4(a) and (b) upon filing of the **First Amended Complaint**, and if issued, will be served upon defendants pursuant to Fed. R. Civ. P. 4(c) and (d).

By: /s/ John Ori Leahy_____