# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| LAMONT HALL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 14 C 6308 |
| ) | |
| ARTHUR HALL and WEXFORD ) | |
| HEALTH SOURCES, INC., ) | |
| ) | |
| Defendants. ) | |

## ORDER ON MOTIONS IN LIMINE REGARDING
## DR. GREGORY BALES AND DR. DAVID MATHIS

In this order, the Court addresses plaintiff Lamont Hall's motions *in limine* to bar testimony by defense experts Dr. Gregory Bales and Dr. David Mathis, which are plaintiff's motions 3 and 4. This order supplements the oral rulings the Court made at the second session of the final pretrial conference, held on April 6, 2018.

The Court has reviewed the reports of Dr. Bales and Dr. Mathis submitted under Federal Rule of Civil Procedure 26(a)(2) and the transcripts of their depositions. In considering the proposed subjects of their testimony, the Court has relied primarily on the reports, which under the Rule are supposed to amount to the equivalent of the retained expert witness's direct examination. *See* Fed. R. Civ. P. 26(a)(2)(B)(i) (expert's report must contain "a complete statement of all opinions the witness will express and the basis and reasons for them"); *id.* 1993 adv. comm. notes ("[T]he report, which is intended to set forth the substance of the direct examination, should be written in a manner that reflects the testimony to be given by the witness . . . .").

**1.      Dr. Bales's anticipated testimony**

Dr. Bales is a reconstructive urologist who has performed numerous surgeries of the type at issue in this case. His opinions are as follows:

- He describes the nature and quality of the reconstructive surgery—a first stage urethroplasty—that was performed shortly after Mr. Hall's injury, and he explains why a full reconstruction could not be done at that time.

- A second stage urethroplasty is elective surgery and need not be done immediately. It was necessary to let 6 to 12 months go by after the original injury and first stage surgery to allow all of the inflammation and edema to recede.

- Mr. Hall's scheduled second stage urethroplasty was delayed because he was arrested for a crime; it would have been done "if Mr. Hall had waited until after the second stage procedure to commit this felony."

- Dr. Bales describes the urologic consultations that Mr. Hall received at UIC Hospital, including with a reconstructive urologist, Dr. Kocjancic, following his incarceration.

- The second stage surgery was "elective", and Dr. Funk (the defendant) "correctly understood that this reconstructive surgery would involve follow-up visits with a reconstructive surgeon" and that the surgery was elective.

- "A parole violator housed at Statesville [sic] NRC could be transferred out of the facility at any time and there was often little notice to medical providers."

- For this reason, it was medically appropriate, and advisable, to delay the surgery until Mr. Hall could receive follow-up care with his reconstructive surgeon.

- Mr. Hall ultimately received the surgery after being transferred to Cook County

- Jail, and the surgery went well. The decision to delay the surgery until that time was a sound decision.
- Regarding Mr. Hall's contention that he did not receive timely care, "committing the home invasion and being incarcerated was counterproductive to coordinating his surgery."
- Mr. Hall is "unable to articulate exactly what the nature of his resulting injury was because of some perceived delay."
- "It appears that there was an understanding of the need for continuity of care by the NRC, the Cook County Jail, and his team of urologists . . . ."
- "I cannot envision any basis for suggesting negligence, indifference, or callous disregard for Mr. Hall's well-being on the part of Dr. Funk and Wexford Health."
- Dr. Bales criticizes at length the report and deposition of Dr. Jaclyn Milose, submitted by Mr. Hall. Among other things, he says that "it would appear that she did not author the medical expert [report]" and that "[i]t would appear that this was a document drafted by the attorneys for Mr. Hall and I would like to believe that Dr. Milose did not thoroughly read the document prior to affixing her signature to it . . . ." Dr. Bales makes specific criticisms of conclusions reached by Dr. Milose.
- Dr. Bales also criticizes the report and conclusions by plaintiff's expert psychologist, Dr. Tiger Devore. Among other things, Dr. Bales states that "I suspect there is some distress that occurred from [Mr. Hall's] initial injury, which would likely occur regardless of his living situation." He says that "[t]o suggest that the short wait, before Mr. Hall underwent his second stage reconstruction,

caused additional distress is hard to fathom." He also says that "it [is] easy to recognize" that Mr. Hall's claimed numbing and pain "result from his gunshot wound," not from the timing of the second stage surgery.

- Mr. Hall had to wait 17 months for his surgery, but many reconstructive urologists believe that a 6-12 month wait is reasonable.

- Dr. Bales concludes with several pejorative references to Mr. Hall's claim and evidence, stating that it is "incredibly disingenuous" to suggest that Mr. Hall received anything less than reasonable and appropriate care; that Dr. Milose's statement that it was not necessary to have follow-up care by the surgeon who performed the surgery is "simply ridiculous"; and that Mr. Hall "should be ecstatic" that the timely care that he received after the gunshot has allowed him to return to normal function." Dr. Bales again repeats that Dr. Funk and Wexford "did not act with deliberate indifference toward Mr. Hall" and did not commit negligence or malpractice.

**2. Dr. Mathis's anticipated testimony**

Dr. Mathis is offered as an expert in prison medical care. In his report, he states that he was "retained to determine if the Defendants committed indifference and/or negligence relevant to the deferral of a surgical procedure" while Mr. Hall was an inmate at the NRC. His report describes the following background:

- He provides, as does Dr. Bales, a detailed recitation of the nature and quality of care that Mr. Hall received following his gunshot injury, including the first stage urethroplasty that was performed upon him.

- He describes when and why Mr. Hall was arrested and taken into custody.

4

- He describes the nature of the medical facilities at the NRC.
- He states what medical personnel at the NRC would have understood regarding how long Mr. Hall would be there.
- He describes in detail, as does Dr. Bales, the nature of his care and treatment at the NRC.
- He summarizes the testimony of others, as well as medical records, regarding the recommendation for a second stage urethroplasty and why it was not carried out while Mr. Hall was at the NRC.
- He describes the treatment that Mr. Hall received at the Cook County Jail, including the second stage urethroplasty that he received while he was there.

Dr. Mathis will offer the following opinions:

- Dr. Funk and Wexford followed the standard of care in not carrying out the second stage urethroplasty while Hall was at the NRC. In this regard, Dr. Mathis recites and relies on testimony by Dr. Funk and the surgeon, Dr. Kocjancic, regarding the possibility of transfer and the need to have the surgeon perform follow-up care.
- Dr. Mathis cites Dr. Kocjancic's testimony that the procedure was elective—"not mandatory"—and opines that there was no harm in delaying the surgery.
- Dr. Mathis states that cost-cutting considerations on the part of Wexford did not impact Mr. Hall's treatment.
- He also states that "continuity of care" considerations were appropriately taken into account by Wexford and that Wexford was not required to undertake "elective" surgery.

- Finally, Dr. Mathis opines that neither Dr. Funk nor Wexford employees were "indifferent to the medical needs of Mr. Hall."

**3.   Admissible and inadmissible opinions and testimony**

The first task for the Court is to cull out any opinions not properly rendered by Dr. Funk or Dr. Mathis at trial. The Court has already ruled that neither expert may properly render an ultimate-issue opinion regarding whether the defendants were deliberately indifferent or negligent or committed malpractice. Likewise, no expert may testify regarding what Dr. Funk (or anyone else) believed, understood, or intended, as these are inappropriate subjects for expert testimony. The Court explained these rulings at the final pretrial conference and need not repeat the explanations here. On the other hand, a defense expert *may* appropriately testify regarding the applicable standard of care and Dr. Funk and Wexford's compliance with that standard.

In addition, as the Court ruled at the final pretrial conference, the defense experts may not testify regarding the manner in which the wound was inflicted on Hall—i.e., that it was self-inflicted. The record, including the statements of the defense experts, establishes beyond peradventure that this is entirely irrelevant regarding what medical treatment was or was not appropriate. In addition, the unfair prejudice of admission of this evidence far outweighs any minuscule probative value it might have, as the Court explained at the final pretrial conference. Similarly, defense experts may not testify regarding Mr. Hall's arrest or commission of a crime and the effect of this on getting a second stage urethroplasty earlier. This, too, is irrelevant and grossly and unfairly prejudicial. The issue to be determined by the jury concerns the treatment that Mr. Hall received and did not receive while imprisoned, not whether he would have received

6

treatment earlier if he had not been convicted of a crime.

Dr. Bales has no qualifications, let alone an adequate basis in what he has reviewed, to testify as a matter of fact or opinion regarding the likelihood or timing of possible transfer of Mr. Hall from the NRC or how much notice physicians there would have regarding transfer. In this regarding he is basically just repeating what he has learned from other sources. The same is true of Dr. Mathis. Defense experts may *rely* on what others have said on these points—and this may be presented to an expert during direct examination as matters or assumptions that he may take into account in rendering his opinions—but no expert may testify in a manner that suggests that these are matters of fact or that they has personal knowledge on these points. Their reports reflect that in this regard, they have made no investigation or inquiry themselves but rather are relying on what others have said.

Dr. Bales may not appropriately testify regarding who authored Dr. Milose's report or the degree of participation by counsel. That is outside his area of expertise. Such testimony is appropriately elicited, if at all, only from Dr. Milose herself. It is appropriate, however, for Dr. Bales to critique the analysis and conclusions in Dr. Milose's report and deposition testimony.

Dr. Bales' pejorative references given toward the end of his opinion and listed in the last bullet point of the Court's earlier discussion of his opinions are excluded, as are any similar references that defendants might offer through defense experts at trial. This includes Dr. Bales's statement that claims that Mr. Hall did not receive adequate treatment are "completely disingenuous"; that certain statements by Dr. Milose in her report or deposition are "simply ridiculous"; and that Mr. Hall "should be ecstatic"

7

regarding the care and treatment he received. Frankly, such statements in a report suggest that Dr. Bales is, at times, acting as an advocate as opposed to a witness, which is inappropriate. *Cf. CFTC v. Oystacher*, No. 15 C 9196, 2015 WL 9259899, at *6 (N.D. Ill. Dec. 18, 2015) (St. Eve, J.) (noting, in a different context, that "experts are not advocates in the litigation but sources of information and opinions."). That aside, these and any similar statements are unfairly prejudicial in a way that significantly outweighs any conceivable probative value that would be derived from a witness communicating this sort of rhetoric in a courtroom.

Finally, the Court addresses Dr. Bales's anticipated testimony on the subject of Mr. Hall's claimed emotional distress and other injury resulting from the delay in having the second stage surgery. As the Court stated at the final pretrial conference on April 6, Dr. Bales may appropriately testify, given his experience, regarding his observations of the impact (physical and mental) of having, not having, and delay this sort of surgery has on patients with the type of injury and condition that Mr. Hall had at the relevant time. But to be clear, Dr. Bales may not appropriately testify regarding *Mr. Hall's* claimed distress or pain and may not render an opinion (as Dr. Bales appeared to do in his report and deposition) regarding the credibility of Mr. Hall's claim that the delay in the surgery caused him distress or other injury.

**4. Duplicative expert testimony**

The otherwise admissible testimony of Dr. Bales and Dr. Mathis overlaps almost completely. Both are offered to render opinions about the need for post-operative care by the surgeon who performs surgery on a patient and the appropriateness of delaying Mr. Hall's surgery while he was at the NRC given the potential that he could be

8

transferred to a different location that would render this sort of continuity of care impossible. The two experts come at this from different perspectives—that of a urological surgeon (Dr. Bales) and that of an expert in correctional medicine (Dr. Mathis)—but their conclusions are the same.

Under Federal Rule of Evidence 403, a court may exclude relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. This rule applies to expert testimony just as it applies to any other evidence. Indeed, this district's local rules—specifically the final pretrial order form incorporated into the rules—have for decades contained a provision stating that "[o]nly one expert witness on each subject for each party will be permitted to testify absent good cause shown." N.D. Ill. LR 16.1.1, Final Pretrial Order form at n.7, *see* [http://www.ilnd.uscourts.gov/_assets/_documents/_forms/_legal/NewRules/New00152.htm](http://www.ilnd.uscourts.gov/_assets/_documents/_forms/_legal/NewRules/New00152.htm) (last visited Mar. 11, 2018).

As the Court has indicated, Dr. Bales and Dr. Mathis each has his own perspective, but this does not diminish the fact that defendants propose to call two experts who will render essentially the same opinions. In considering the issue of cumulativeness, the Court also takes into account the fact that defendants also intend to elicit from Dr. Kojancic, the urological surgeon at UIC who would have performed the surgery had it not been delayed, opinions on the same point, specifically the need for follow-up care by the surgeon who performs the surgery and the inappropriateness of conducting surgery if this cannot be assured. Dr. Kocjancic is also a fact witness, but

he will effectively be a third expert on this point if defendants are permitted to call both Dr. Bales and Dr. Mathis. (The Court excludes from the analysis of undue cumulativeness the testimony of Dr. Funk, who also will opine on this subject but will do so as part of an explanation of why he acted as he did regarding the matters in controversy.)

The Court concludes that the presentation of two retained experts on the subject of defendants' compliance with the standard of care amounts to the needless presentation of cumulative evidence, and it also unfairly prejudices Mr. Hall, who has only one witness on this point (an arguably tainted witness, Dr. Milose, who has attempted to "withdraw" her opinion favorable to Mr. Hall's claims). The Court appreciates that, as a matter of trial strategy, it is more advantageous to have two experts from different fields interpret and assess a body of evidence. But that does not make their testimony any less needlessly cumulative or unfairly prejudicial. The Court concludes that this significantly outweighs the probative value of the duplicative or cumulative evidence. A trial should not reduce itself to an exercise of counting up and comparing the number of witnesses who testify for each side on a particular topic. That, however, is what defendants' presentation of cumulative expert testimony will encourage. Thus defendants will have to choose between Dr. Bales and Dr. Mathis to testify on these points. Dr. Kocjancic may also testify (consistent with the Court's rulings at the final pretrial conference) as may, of course, Dr. Funk.

There is one point—a narrow one—on which Dr. Mathis's testimony does not overlap with or duplicate that of Dr. Bales. This point involves Dr. Mathis's opinion that cost-cutting or financial incentives did not impact Wexford's treatment of Mr. Hall. If

defendants pick Dr. Bales rather than Dr. Mathis to render opinions regarding compliance with the standard of care, then they may, if they wish, still call Dr. Mathis to testify on this single, narrow point. But this testimony will have to be zeroed in on this particular point; the Court will not permit Dr. Mathis to stray beyond it and render testimony or opinions that duplicate other evidence.

Finally, the Court expects and directs all counsel to instruct their witnesses regarding testimony that the Court has excluded so that such testimony is not elicited or rendered at trial.

Date: April 7, 2018

                                                s/ Matthew F. Kennelly
                                                MATTHEW F. KENNELLY
                                                United States District Judge