## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **LAMONT HALL,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case No. 14 C 6308** |
| ) | |
| **ARTHUR FUNK, M.D. and WEXFORD** ) | |
| **HEALTH SOURCES, INC.,** ) | |
| ) | |
| **Defendants.** ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

MATTHEW F. KENNELLY, District Judge:

Plaintiff Lamont Hall sued Wexford Health Sources, Inc. and Dr. Arthur Funk, alleging that they violated his constitutional rights and committed intentional infliction of emotional distress by refusing to authorize surgery to repair a hole in his penis while he was incarcerated at the Illinois Department of Corrections' Northern Reception and Classification Center. After a trial, a jury found in favor of Dr. Funk on both the constitutional and state-law claims but found Wexford liable under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), and awarded Hall $425,000 in compensatory and punitive damages. Wexford has moved for judgment as a matter of law or alternatively for a new trial. Hall has moved to recover attorney's fees and costs.

### Background

In late 2012, Lamont Hall suffered a gunshot wound to his groin and underwent surgery that left a hole in the underside of his penis. Before Hall's follow-up surgery to

repair the hole, he was arrested and convicted of a criminal offense arising from a separate matter. He was ultimately incarcerated at the Northern Reception and Classification Center (NRC), located at the Stateville Correctional Center. While at the NRC, Hall was required to wash and self-catheterize his penis in front of other inmates, which he says caused him significant embarrassment and emotional distress.

Hall sued Dr. Arthur Funk, a physician at the NRC, alleging that he was deliberately indifferent to Hall's serious medical need in violation of the Eighth Amendment and committed intentional infliction of emotional distress by refusing to authorize surgery to repair his penis. Hall also sued Wexford Health Sources, Inc., the company that contracts to provide medical services at the NRC, alleging, under *Monell*, that Wexford's policy of denying so-called "elective" surgeries violated his constitutional rights.

The case went to trial in April 2018. The jury returned a verdict in favor of Dr. Funk on both counts but found for Hall on his *Monell* claim against Wexford, awarding him $125,000 in compensatory damages and $300,000 in punitive damages. The Court, initially concerned that the verdict was inconsistent, instructed the jurors to continue deliberating, then excused the jury for the weekend. Before the jury was reconvened, however, the Court held oral argument on the propriety of the verdict, reversed its decision, and accepted the verdict.

Wexford has moved for judgment as a matter of law or alternatively for a new trial. Hall has moved to recover attorney's fees and costs. The Court apologizes for its inordinate delay in ruling on these motions.

## Discussion

Wexford argues that it is entitled to judgment as a matter of law under Federal Rule of Civil Procedure 50 for two reasons: first, there cannot be *Monell* liability without individual liability, and second, the evidence was insufficient to support a finding that Dr. Funk was deliberately indifferent. In the alternative, Wexford has moved for a new trial under Rule 59, arguing that the jury instructions were confusing and that the Court wrongly excluded certain evidence and thereby deprived Wexford of a fair trial.

Finally, Hall has moved for attorney's fees under 42 U.S.C. § 1988 and has submitted a bill of costs. The parties agree on the amount of the attorney's fees, but Wexford objects to the bill of costs on several grounds.

## A.     Motion for judgment as a matter of law

A court may grant a motion for judgment as a matter of law "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a); *May v. Chrysler Group, LLC*, 716 F.3d 963, 970-71 (7th Cir. 2013). The court must "review all of the evidence in the record," but in doing so it must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Robinson v. Perales*, 894 F.3d 818, 833 (7th Cir. 2018) (quoting *Reeves v. Sanderson Pluming Prods., Inc.*, 530 U.S. 133, 150-51 (2000)).

Wexford argues that it is entitled to judgment as a matter of law because the jury verdict was inconsistent and the evidence was insufficient to support the verdict.

### 1. Consistency of the verdict

Wexford first argues that the jury verdict is inconsistent as a matter of law.  In evaluating this argument, the "court must reconcile apparently inconsistent verdicts, rather than overturn them."  *Deloughery v. City of Chicago*, 422 F.3d 611, 617 (7th Cir. 2005).  A verdict is inconsistent only if "no rational jury could have brought back the verdicts that were returned."  *Id.* (internal quotation marks omitted).

At the outset, the Court notes that Wexford cannot support its argument for judgment as a matter of law by invoking an allegedly inconsistent jury verdict.  "A new trial on all claims is the appropriate remedy (rather than judgment as a matter of law) in a case in which the jury has returned inconsistent verdicts."  *Id*.  But whether evaluated as part of the motion for a new trial or as a basis for judgment as a matter of law, Wexford's argument fails because the jury's verdict was not inconsistent.

Wexford argues that the jury could not have found it liable after finding in favor of Dr. Funk.  It cites the Supreme Court's decision in *City of Los Angeles v. Heller*, 475 U.S. 796 (1986), for the proposition that "neither *Monell* . . . nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm."  *Id.* at 799.  Wexford maintains that *Heller* is an absolute bar to liability in this case because the jury's finding in favor of Dr. Funk conclusively shows that there is no constitutional harm for which Wexford could be liable.

The Seventh Circuit has clarified, however, that *Heller* does not sweep as broadly as Wexford contends.  In *Thomas v. Cook County Sheriff's Department*, 604 F.3d 293 (7th Cir. 2010), the Seventh Circuit considered whether the county could be

held liable even though its individual officers were found not to have committed a constitutional violation.  The court rejected the county's argument, calling it "an unreasonable extension of *Heller*."  *Id.* at 305.  The court held that an entity does *not* escape liability whenever the individual officers are found not liable, but only when those two findings together "would create an *inconsistent* verdict."  *Id.*  And whether the verdict is inconsistent depends, in turn, on "the nature of the constitutional violation, the theory of municipal liability, and the defenses set forth."  *Id.*

*Thomas* establishes that the verdict in this case is consistent.  In *Thomas*, as here, the plaintiff alleged that he was unconstitutionally denied medical care, which requires showing both that the plaintiff's medical condition was objectively medically serious and that the defendants acted with a sufficiently culpable state of mind. *Thomas*, 604 F.3d at 305; *see also Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008). In this context, "the jury could have found that [the individual defendants] were not *deliberately indifferent* to [the plaintiff's] medical needs, but simply could not respond adequately because of the well-documented breakdowns in the [entity defendant's] policies . . . ."  *Thomas*, 604 F.3d at 305.  In other words, the two verdicts are not inconsistent because the jury might have concluded that Dr. Funk lacked the requisite mental state for liability but that Wexford's policies were nonetheless responsible for a violation of Hall's constitutional rights.

This conclusion finds further support in *Glisson v. Indiana Department of Corrections*, 849 F.3d 372 (7th Cir. 2017) (en banc).  *Glisson* involved a suit under section 1983 alleging that the medical staff and the company providing health services in an Indiana prison were deliberately indifferent to the decedent's serious medical

needs. The district court dismissed the *Monell* claims against the defendant entity after it granted summary judgment in favor of the individual defendant doctors and nurses. The Seventh Circuit reversed, noting that the "case well illustrates why an organization might be liable even if its individual agents are not. . . . [I]f institutional policies are themselves deliberately indifferent to the quality of care provided, institutional liability is possible." *Id.* at 378. *Glisson* therefore clearly establishes that entities may be liable under *Monell*, particularly in the context of denial of medical care, even when the entity's agents have not personally committed a constitutional violation.

Wexford's effort to distinguish *Glisson* is unavailing. First, Wexford's observation that four judges dissented from the *en banc* opinion does not constitute a basis for this Court to disregard recent, binding precedent. In any case, the dissent's dispute with the majority concerned the sufficiency of the *evidence* of the defendant entity's indifference and its causal relationship to the harm—not the underlying premise that the entity may be liable even when individual officers are not. *See id.* at 383 (Sykes, J., dissenting).

Second, Wexford points out that *Glisson* involved multiple individual defendants and an allegation that the entity failed to appropriately coordinate group care. This distinction is similarly immaterial. *Glisson*'s fundamental similarity to this case is simply that "none of the individual providers . . . personally did anything that would qualify as 'deliberate indifference' for Eighth Amendment purposes," *id.* at 375, which is what the jury found here. *See also Miranda v. County of Lake*, 900 F.3d 335, 344 (7th Cir. 2018) (citing *Glisson* for the proposition that "*Monell* liability is possible even if no individual official is found deliberately indifferent"). The Seventh Circuit concluded that notwithstanding a finding in favor of the individual defendants, a reasonable jury

6

nonetheless could have found the entity defendant liable under *Monell*. The same is true here.

The contrary authority Wexford cites does not undermine the rule in *Thomas* and *Glisson*. In *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658 (7th Cir. 2016), for example, the Seventh Circuit noted that "if the plaintiff's theory of *Monell* liability rests entirely on individual liability . . . negating individual liability will automatically preclude a finding of *Monell* liability." *Id.* at 664. But that observation is entirely consistent with *Thomas* and its application to this case: what matters is whether the *Monell* claim is fully dependent on the individual claim, or whether it can survive a finding in favor of the individual defendant. Indeed, the facts of *Whiting* furnish a useful contrast. There, the plaintiff's theory of *Monell* liability asserted that the individual defendant was acting as the policymaker on behalf of the entity when he committed the alleged harm. *Id.* at 664. Under that theory, there could be no *Monell* liability unless the individual defendant is also liable. But this case presents no such equivalence between the two theories of liability. Instead, Hall's claim of *Monell* liability rested on evidence that Wexford had a policy or practice of denying surgeries it deemed "elective" irrespective of the patient's medical needs. The existence of that policy, and the possibility that it caused Hall to be denied necessary medical care, are logically independent of the question of whether Dr. Funk possessed a culpable mental state.

The other Seventh Circuit cases that putatively contradict *Thomas* are distinguishable because they concern allegations of excessive force. *See Sallenger v. City of Springfield*, 630 F.3d 499 (7th Cir. 2010); *Jenkins v. Bartlett*, 487 F.3d 482 (7th Cir. 2007); *Thompson v. Boggs*, 33 F.3d 847 (7th Cir. 1995). These cases differ

7

crucially from cases about the denial of medical care because excessive force claims do not have a subjective element. *See McDonald by McDonald v. Haskins*, 966 F.2d 292, 292-93 (7th Cir. 1992) (describing the "purely objective test for excessive force claims"). As explained above, this subjective element—deliberate indifference—constitutes the basis on which the jury reached divergent findings on the liability of Wexford and Dr. Funk. (Concededly, the court in *Sallenger* also dismissed in passing the possibility of *Monell* liability without individual liability in the denial-of-medical-care context. *Sallenger*, 630 F.3d at 505. But that argument was not presented to the court, whereas the contrary holdings of *Thomas* and *Glisson* analyze the issue squarely and in significant detail. *Thomas* and *Glisson* therefore control this case, especially given their factual similarity to the denial of medical care in this action.)

### 2. Consistency with the jury instructions

The jury's verdict also conforms to the instructions. The Court gave the jury the following instructions with respect to counts 1 (the individual constitutional claim against Dr. Funk) and 3 (the *Monell* claim against Wexford):

**First claim – failure to provide medical care (Dr. Funk)**

To succeed on his first claim, which is against Dr. Funk, Mr. Hall must prove each of the following four propositions by a preponderance of the evidence:
1. Mr. Hall had a serious medical need. A serious medical need is a condition that a doctor says requires treatment, or that is so obvious that even someone who is not a doctor would recognize it as requiring treatment.
2. Dr. Funk was aware that Mr. Hall had a serious medical need. You may infer this from the fact that the need was obvious.
3. Dr. Funk consciously failed to take reasonable measures to provide treatment for Mr. Hall's serious medical need. Delaying treatment may constitute a failure to take reasonable measures if the delay unnecessarily prolonged Mr. Hall's pain. In deciding whether Dr. Funk consciously failed to take reasonable measures, you may consider the

seriousness of Mr. Hall's medical need, how difficult it would have been for Dr. Funk to provide treatment, and whether Dr. Funk had legitimate reasons related to safety or security for failing to provide treatment.

4. As a result of Dr. Funk's actions or inaction, Mr. Hall was harmed. Mr. Hall may establish this by showing that he suffered prolonged, unnecessary pain.

[. . .]

**Third claim – failure to provide medical care (Wexford)**

To prevail on his third claim, which is against Wexford, Mr. Hall must prove each of the following three propositions by a preponderance of the evidence:

1. Dr. Funk failed to provide medical care to Mr. Hall, as described in the instructions regarding Mr. Hall's first claim.
2. At the time, Wexford had a policy of refusing to allow inmates at the Northern Reception Center (NRC) to receive surgeries deemed to be elective.
3. Wexford's policy caused Dr. Funk to fail to provide medical care to Mr. Hall as described in the instructions regarding Mr. Hall's first claim.

Dkt. no. 207, at 11, 13. Wexford contends that the *Monell* instruction, which refers to the failure "to provide medical care to Mr. Hall as described in the instructions regarding Mr. Hall's first claim," incorporates the requirement that Dr. Funk acted with deliberate indifference. As a result, Wexford argues, the jury instructions prohibited the jury from both finding in favor of Dr. Funk and finding Wexford liable.

This argument mischaracterizes the *Monell* instruction. The reference to count 1 specifically refers to Dr. Funk's conduct—that is, his "failure to provide medical care"— and not to his subjective mental state. By its express terms, the *Monell* instruction required the jury only to find that Dr. Funk failed to provide medical care, and not that he acted with deliberate indifference. It was therefore consistent with this instruction for the jury to find Wexford liable while also finding in favor of Dr. Funk.

Finally, the Court acknowledges that there may be an argument that the *Monell* instruction misstated the law by failing to require the jury to find that Wexford's policies

were themselves deliberately indifferent. But Wexford did not raise this objection at trial—indeed it agreed to the *Monell* instruction and did not propose an alternative—and it does not make this objection even now. To the contrary, Wexford argues that *Thomas* does not apply and, by implication, that an instruction based on *Thomas* would have been erroneous. Wexford therefore has waived any issue based on potential error in the *Monell* instruction.

### 3. Sufficiency of the evidence

Wexford also argues that it is entitled to judgment as a matter of law because the evidence presented at trial was insufficient to permit a reasonable jury to find that Dr. Funk had been deliberately indifferent. The cases discussed in the previous section show, however, that this is the wrong question. Dr. Funk's deliberate indifference is not essential to Wexford's liability. For example, the evidence that Wexford contends shows that Dr. Funk's treatment decision was not a substantial departure from accepted medical standards is relevant only to Dr. Funk's alleged deliberate indifference, not to Wexford's liability. *See McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013) (explaining that the "substantial departure" standard is relevant to determine only whether a defendant medical professional acting in a professional capacity was deliberately indifferent). Wexford's sufficiency argument is therefore best understood simply as another challenge to the consistency of the verdict. Because the Court concludes that the jury's verdict is not inconsistent for the reasons set forth above, Wexford is not entitled to judgment or a new trial on that basis.

### B. Motion for a new trial

In addition to its motion for judgment as a matter of law, Wexford has moved in

the alternative for a new trial.  Federal Rule of Civil Procedure 59 permits the court to grant a new trial after a jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  "A new trial should be granted only when the record shows that the jury's verdict resulted in a miscarriage of justice of where the verdict, on the record, cries out to be overturned or shocks our conscience."  *Estate of Burford v. Accounting Practice Sales, Inc.*, 851 F.3d 641, 646 (7th Cir. 2017).

### 1.  Confusing jury instructions

Wexford first argues that it is entitled to a new trial because the jury instructions were confusing.  A party who seeks a new trial based on an allegedly faulty jury instruction must show that the "instruction misstates the law in a way that misguides the jury to the extent that the complaining party suffered prejudice."  *Armstrong v. BNSF Ry. Co.*, 880 F.3d 377, 381 (7th Cir. 2018) (internal quotation marks omitted).  The moving party must show both confusion *and* prejudice; "[e]ven if we believe that the jury was confused or misled, we would need to find that the defendants were prejudiced before ordering a new trial."  *Jimenez v. City of Chicago*, 732 F.3d 710, 717 (7th Cir. 2013).

As a threshold matter, Wexford has waived its objections to the jury instructions by failing to raise them at trial despite being given the opportunity to do so.  Fed. R. Civ. P. 51(c); *Schmitz v. Canadian Pacific Ry. Co.*, 454 F.3d 678, 683 (7th Cir. 2006) ("Rule 51 . . . forecloses a party from claiming instructional error unless he properly objects to the giving or withholding of a requested instruction.")  As explained above, Wexford never objected to the alleged deficiencies in the *Monell* instructions that it argues warrant a new trial; indeed, Wexford agreed to the instruction and did not propose any

alternative. The Court therefore finds that Wexford has waived these objections.

But even if Wexford had properly objected to the jury instructions, it has not shown that it is entitled to a new trial. First, even now, Wexford does not argue that the *Monell* instruction was legally erroneous. Instead, it contends that the instruction was legally accurate but that the jury failed to follow it. *See* Wexford's Mot., dkt no. 220, at 11. Without showing that the instruction misstated the law, Wexford cannot prevail on its motion for a new trial. *See Guzman v. City of Chicago*, 689 F.3d 740, 745 (7th Cir. 2012) ("This inquiry requires us first to determine whether an instruction misstates or insufficiently states the law . . .").

Second, even if the Court were to charitably read Wexford's motion as implicitly alleging error in the *Monell* instruction, Wexford's legal theory is incorrect. Again, Wexford's contention—its only contention—is that the instruction failed to tie its liability to a finding of individual liability regarding Dr. Funk. As the Court previously discussed, the Seventh Circuit's decisions in *Thomas* and *Glisson* show that *Monell* liability does not depend on individual liability in this case. Indeed, *Thomas* and *Glisson* make clear that an instruction tethering Wexford's liability to Dr. Funk's individual liability would have been erroneous.[1]

Third, Wexford argues that the fact that the jury submitted questions to the Court asking to clarify the relationship between the two counts is evidence of confusion. Although the jury may have been confused initially, the Court's responses to the jury's questions were accurate and appropriate. The jury's first note stated that they were

---

[1] As the Court previously noted, if there was any error in the *Monell* instruction, it was the failure to instruct the jury on the standard for Wexford's deliberate indifference. But Wexford did not argue this before, and it does not argue it now.

"unable to come to agreement on #3 of the first claim," and that they did not "think [they] could] decide the subsequent claims" until they had done so. Dkt. no. 214. In response, the Court re-read the final instruction and instructed the jury to continue deliberating. Trial Tr., dkt. no. 220-4, at 655-56. The jury's second note asked whether they could "come to agreement on" the *Monell* claim "[i]f we can't agree on the first claim." Dkt. no. 215. In response, the Court wrote a note stating that it could not give further instructions on that question and asking the jurors to rely on the instructions they had already been given. *Id.* Because the original instructions accurately reflected that Wexford could be liable independently of Dr. Funk's liability, the Court's responses referring the jury to the original instructions were appropriate. *See United States v. Mealy*, 851 F.2d 890, 902 (7th Cir. 1988) ("If the original jury charge clearly and correctly states the applicable law, the judge may properly answer the jury's question by instructing the jury to reread the instructions.").

After the jury returned its verdict, the Court initially believed the verdict was inconsistent, told the jury this, and instructed the jury to continue deliberating. Trial Tr., dkt. no. 220-4, at 673. Shortly thereafter, the jury submitted its final note, which stated, "Page 9 says, you must consider each claim separately, which is what we did, separate defendants, and we found against Wexford but not Funk. Why is this not okay?" *Id.* at 674. This note suggests that the jury correctly understood that counts 1 and 3 were independent of one another and that Wexford's liability did not depend on Dr. Funk's liability.

Finally, even if the jury's questions evince some degree of confusion on the part of some jurors, for the reasons previously discussed, Wexford has not shown that it was

prejudiced by the misstatement of the law it claims: under the law as it applied in this case, Wexford's liability did not depend on Dr. Funk's individual liability. Confusion without prejudice does not warrant a new trial. *Jimenez*, 732 F.3d at 717.

## 2.    Evidentiary arguments

Wexford also argues that a new trial is required because of the Court's decision to exclude certain evidence. When considering evidence that was allegedly wrongfully excluded, a "new trial is warranted only if the error has a substantial and injurious effect or influence on the determination of a jury and the result is inconsistent with substantial justice." *Burton v. City of Zion*, 901 F.3d 772, 776 (7th Cir. 2018) (internal quotation marks omitted). The party seeking a new trial must "show that an average juror would have found the omitted evidence persuasive." *Id.* If the evidentiary rulings do not warrant a new trial when considered individually, they may nonetheless justify a new trial based on "cumulative prejudice," which "occurs when (1) . . . multiple errors occurred at trial; and (2) those errors, in the context of the entire trial, were so severe as to have rendered the trial fundamentally unfair." *Thompson v. City of Chicago*, 722 F.3d 963, 979 (7th Cir. 2013) (internal quotation marks omitted) (alteration in original).

### a.    Felony conviction

Wexford argues that it should have been permitted to introduce evidence that Hall was in prison in connection with a firearm-related felony. This argument is unpersuasive given that the Court permitted Wexford to introduce evidence that Hall was a parole violator who was in prison for a felony at all relevant times. To the extent that Wexford objects to Hall's attorneys characterizing him as a "victim of happenstance," Wexford's Mot., dkt. no. 220, at 14, the evidence that he was in prison

14

because he committed a felony suffices to rebut that inference. The Court admitted the relevant part of the evidence, which was sufficient to prevent any prejudice to the Wexford.

Wexford further argues, however, that the *nature* of the conviction had special importance because it "provides a window into Hall's mind; specifically, the weight and importance that he placed upon the second-stage surgery to correct the defect, and the alleged emotional state he was in." Wexford's Reply Br., dkt. no. 227, at 8. But Wexford has failed to explain what is uniquely significant about the fact that Hall was in prison on a firearms conviction, and the suggestion that the nature of his felony has any bearing on his view of the importance of the surgery is speculative and unsupported. More plausible is that Wexford hoped to introduce this evidence to imply that Hall had a character for criminality. As this Court noted in an earlier ruling, this evidence is "irrelevant and grossly and unfairly prejudicial," Order of April 7, 2018, dkt. no. 199, at 6, and its exclusion does not warrant a new trial.

### b. Self-inflicted wound

Wexford also argues that it is entitled to a new trial because the Court excluded evidence that Hall's gunshot wound was self-inflicted. Wexford asserts that this evidence would have shown that Hall did not primarily suffer embarrassment because of the hole in the base of his penis that required him to self-catheterize in front of other prison inmates every day, but because he shot himself.

This argument lacks any evidentiary basis. First, Wexford cites the following deposition testimony:

> Q: Sure. Were they ridiculing you because you had shot yourself or were they ridiculing you because of the catheterization?

15

[objections omitted]

A:     What I am sure of, they was harassing me and stuff due to the fact that I had to self-catheterize and sit and use it as a woman.  And, you know, they was making all type of disturbing remarks.

Hall Dep., dkt. no. 220-6, at 60:1-8.  Wexford presents this testimony as evidence that Hall was embarrassed by having shot himself, but it plainly says the opposite.  In its reply brief, Wexford reframes its argument to assert that because Hall failed to say that the inmates did not know that he had shot himself (information the question did not ask for), the other inmates must have known, and therefore they must have made fun of him for that reason.  In fact, Hall expressly identified the cause of his harassment and embarrassment, which was that he had to self-catheterize.  Any other inferences from this testimony are wildly speculative at best.

Second, Wexford cites the deposition testimony of Dr. Tiger Devore, an expert witness for the plaintiff, that a self-inflicted gunshot wound would produce a different emotional response than being shot by someone else.  It argues that cross-examining Dr. Devore about the psychological effect of a self-inflicted gunshot wound would have undermined Dr. Devore's conclusions about the cause of his psychological harm.  In fact, Wexford did cross-examine Dr. Devore about Hall's preexisting psychological issues and argued in its closing that these factors caused his psychological injuries.  Wexford offers no explanation or evidence suggesting that excluding the self-inflicted nature of the wound had a substantial and injurious effect on the jury's determination.

As the Court noted in an earlier ruling, the evidence that the gunshot wound was self-inflicted "is entirely irrelevant regarding what medical treatment was or was not appropriate," and its admission would work "unfair prejudice" that "far outweighs any minuscule probative value it might have."  Order of April 7, 2018, dkt. no. 199, at 6.

16

Considering this substantial risk of unfair prejudice, even if the evidence that the wound is self-inflicted were probative, Wexford has failed to explain why excluding that evidence was so injurious as to be "inconsistent with substantial justice." *Burton*, 901 F.3d at 776.

Finally, even if the Court were to find that excluding both pieces of evidence—the nature of Hall's felony conviction and the self-inflicted gunshot wound—was erroneous, their exclusion, considered together, does not constitute "cumulative prejudice" sufficient to "render[] the trial fundamentally unfair." *Thompson*, 772 F.3d at 979.

## C.     Attorney's fees and bill of costs

Having concluded that Wexford is not entitled to a new trial or judgment as a matter of law, the Court turns to Hall's motion for attorney's fees and bill of costs.

### 1.     Attorney's fees

In an action under 42 U.S.C. § 1983, the district court "may allow the prevailing party . . . a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b); *Capps v. Drake*, 894 F.3d 802, 804 (7th Cir. 2018). The starting point for determining a reasonable attorney's fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. *Thorncreek Apartments III., LLC v. Mick*, 886 F.3d 626, 638 (7th Cir. 2018). In cases brought by a prisoner, however, the attorney's fee is limited by statute in two respects. First, the total fee may not exceed 150% of the damages award. 42 U.S.C. § 1997e(d)(2). Second, the prisoner's attorney must recover 25% of the fee award from their client's judgment. *Id*.

Hall has moved to recover $531,250 in attorney's fees. Because Hall was awarded $425,000, this amount complies with 42 U.S.C. § 1997(d)(2) because it equals

150% of the damages award less 25%. Wexford does not dispute that a fee of $531,250 is permitted under the statute.

Wexford also agrees that the requested attorney's fee is reasonable given the significant number of hours Hall's attorneys invested in this case over the past three years. Hall has submitted timesheets showing that the attorneys, paralegals, and project assistants working on his case billed nearly 5,000 hours at a total value exceeding $3 million. The Court need not determine whether $3 million is a reasonable fee because it is almost six times the statutory maximum that Hall is permitted to recover. The Court finds that Hall's requested fee is reasonable and awards an attorney's fees in the amount of $531,250.

### 2.      Bill of costs

Federal Rule of Civil Procedure 54 instructs that "costs—other than attorney's fees—should be allowed to the prevailing party" unless "a court order provides otherwise." Fed. R. Civ. P. 54(d)(1). By statute, recoverable costs include (1) fees of the clerk and marshal; (2) fees for transcripts necessarily obtained for use in the case; (3) fees and disbursements for printing and witnesses; (4) fees for copies necessarily obtained for use in the case; (5) docket fees; and (6) compensation of court appointed experts and interpreters. 28 U.S.C. § 1920; *Republic Tobacco Co. v. N. Atlantic Trading Co.*, 481 F.3d 442, 447 (7th Cir. 2007). The losing party bears the burden of showing that taxed costs are not appropriate. *Beamon v. Marshall & Ilsley Tr. Co.*, 411 F.3d 854, 864 (7th Cir. 2005).

Hall's bill of costs claimed $30,601.49 in expenses, of which Wexford disputes $14,216.64.

### a.   Service of summons and subpoenas

First, Wexford objects to $1,245 in costs for the service of subpoenas.  It argues that because Hall used a special process server (instead of serving subpoenas by certified mail) and has not demonstrated the necessity of doing so, he may not recover any of those costs.  Second, Wexford argues that Hall may only recover trial subpoena costs for witness who testified at trial, and that the subpoena costs for several non-testifying witnesses must be denied as unnecessary.

Hall is entitled to recover the full $1,245 in subpoena service costs.  Costs arising from the use of special process servers are recoverable so long as they do not exceed the rate that the U.S. Marshals Service would have charged.  *Hillman v. City of Chicago*, No. 04-CV-6671, 2017 WL 3521098, at *9 (N.D. Ill. Aug. 16, 2017) (citing *Collins v. Gorman*, 96 F.3d 1057, 1060 (7th Cir. 1996)).  Hall's bill of costs satisfies this requirement because it charges the lesser of the U.S. Marshals Service's rate and the actual amount paid to the process servers.  *See* Pl.'s Ex. A., Summ. of Costs, dkt. no. 229-1, at 1.  And Hall is not limited to recovering service fees for witnesses who testified at trial; he may recover the costs of serving subpoenas to any witnesses whose testimony was "necessary at the time [it was] sought."  *Ayala v. Rosales*, No. 13-CV-04425, 2016 WL 2659553, at *3 (N.D. Ill. May 9, 2016).  Hall argues that he listed all the subpoenaed witnesses on his pretrial disclosures and intended to call them at trial. Wexford's conclusory allegation that these witnesses were "unnecessary" does not satisfy its burden to show that the service costs are inappropriate.

### b.   Transcripts

Hall seeks $18,097.06 for the costs of obtaining deposition and trial transcripts.

Wexford objects only to certain costs associated with deposition transcripts. It argues that some categories of expenses—that is, the costs of video recordings, court reporter attendance fees, deposition exhibits, and delivery, shipping, and handling—are non-recoverable. It also argues that Hall's per-page rate improperly exceeds the limits imposed by the fee schedule of the United States Judicial Conference in violation of Northern District of Illinois Local Rule 54.1(b).

With several exceptions, Wexford's objections to the transcript costs are generally unfounded. First, comparing the invoices to Hall's schedule of costs reveals that Hall is not seeking to recover the costs of conducting or obtaining video recordings. *See* Pl.'s Ex. A, Summ. of Costs, dkt. no. 229-1, at 1-2; Pl.'s Ex. B, Dep. & Trial Tr. Invoices, dkt. no. 229-2.

Second, it is simply untrue as a matter of law that Hall may not recover the attendance fee or the cost of obtaining deposition exhibits. The Seventh Circuit has held that the district court has discretion to award costs "'incidental' to the taking of the depositions, . . . such as per diem and delivery charges by the court reporter." *Finchum v. Ford Motor Co.*, 57 F.3d 526, 534 (7th Cir. 1995). And "[c]ourts in this district have found costs associated with deposition exhibits taxable on the ground that exhibits are essential to understanding the content of a deposition, especially in a complex and heavily litigated case." *Springer v. Ethicon, Inc.*, No. 17 C 3930, 2018 WL 1453553, at *14 (N.D. Ill. Mar. 23, 2018) (internal quotation marks omitted). Though deposition exhibits are non-recoverable when the party was already in possession of those exhibits, *Cengr v. Fusibond Piping Sys., Inc.*, 135 F.3d 445, 456 (7th Cir. 1998), Wexford has not shown or even alleged that Hall was already had the exhibits in

20

question.

Third, Wexford is mistaken about the nature of Hall's requested transcript costs. A review of Hall's invoices and the schedule of costs reveals that, in general, Hall has properly adjusted those costs to align with the United States Judicial Conference schedule of costs by calculating an adjusted total using the maximum allowed per-page rate of $3.65 for original transcripts. *See* Pl.'s Ex. A, Summ. of Costs, dkt. no. 229-1, at 1-2; Pl.'s Ex. B, Dep. & Trial Tr. Invoices, dkt. no. 229-2; U.S. Courts, Federal Court Reporting Program, http://www.uscourts.gov/services-forms/federal-court-reporting-program#rates (last visited Mar. 11, 2019).

Hall's request includes a few errors, however. The schedule for the deposition transcripts of Hall, Allen Chernoff, Tiger Devore, and Jaclyn Milose improperly request a per-page rate of $3.65, even though this is the authorized rate for original transcripts and Hall's attorneys obtained copies. Adjusting the costs for those transcripts according to the $.90-per-page rate for copies yields a total combined cost of $648.00 for those four transcripts, rather than the requested $2,066.99. But Hall also under-charged for the deposition transcript of David Mathis because of an apparent typographical error. The requested cost of that transcript—$8.69—should instead be $868.70.

Hall also improperly requests court reporter attendance fees that exceed the maximum rates set by the Clerk, which are "$110 for one half day (4 hours or less), and $220 for a full day attendance fee." Northern District of Illinois, Transcript Rates, http://www.ilnd.uscourts.gov/Pages.aspx?page=transcriptrates (last visited Mar. 11, 2019). Adjusting the requested attendance fees to conform to these rates reduces the cost from $3,250 to $1,870.

Finally, Wexford is correct that a plaintiff generally may not recover the "costs associated with delivering, shipping, or handling transcripts," which "are typically non-recoverable ordinary business expenses." *Intercontinental Great Brands LLC v. Kellogg N. Am. Co.*, No. 13 C 321, 2016 WL 316865, at *3 (N.D. Ill. Jan. 26, 2016). Because Hall has not shown that the shipping and handling costs associated with the deposition transcripts are reasonable and necessary, rather than simply for his attorneys' convenience, he is not entitled to $329.50 in delivery costs.

After correcting Hall's per-page and court reporter attendance rates to conform to the applicable fee schedules and deducting the costs for shipping and handling, the Court concludes that Hall is entitled to $14,409.59 for the total cost of transcripts.

### c. Printing, duplication, and data

Hall claims $9,608.96 in expenses related to printing, duplication, and data. Wexford objects to that entire amount, arguing that Hall has not adequately demonstrated the necessity of each of the expenses.

A party seeking to recover printing and data costs need provide only "the best breakdown obtainable from retained records." *Northbrook Excess & Surplus Ins. Co. v. Procter & Gamble Co.*, 924 F.2d 633, 643 (7th Cir. 1991). The Seventh Circuit has held in an analogous context that an affidavit attesting to the necessity of the costs is sufficient. *Nat'l Org. for Women v. Scheidler*, 750 F.3d 696, 698 (7th Cir. 2014) (observing that "[n]o sensible legal system requires parties to waste $60 of lawyers' time to explain spending $6 on making a copy of something"). But a court cannot award any copying costs "unless it has some confidence that the costs are, in fact, recoverable, reasonable, and not incurred merely for the convenience of counsel." *Springer*, 2018

22

WL 1453553, at *17.

The breakdown Hall attached to his bill of costs is deficient because it does not specify the purpose of each expense, and Hall's attorneys have not submitted an affidavit attesting to their necessity. Without this information—or at least one or the other—the Court cannot verify the propriety of the printing costs to ensure that they are not duplicative or solely for the attorneys' convenience. Hall has attempted to shore up his request by submitting an additional summary of the printing and data invoices that ties each expenditure to a corresponding phase of the litigation. *See* Pl.'s Ex. 1, Add'l Summ. of Pl.'s Invoices for Printing & Copying Costs, dkt. no. 231-1. But this supplemental exhibit also lacks appropriate verification, and it does not offer any means of vetting the necessity of the costs.

Without providing evidence that the costs were necessary, Hall cannot recover full amount requested for printing, duplication, and data costs. Given the history of this case, the Court concludes that Hall's request for $9,608.96 in costs for printing, duplication, and data is excessive. The Court will award $3,202.99 in printing costs, or one-third of the requested amount.

### d. Witness expenses

Wexford's final objection to the bill of costs concerns the witness fees for Allen Chernoff, Ervin Kocjancic, Anna McBee, and Rose Perry. It argues that because those witnesses did not testify, Hall may not recover the corresponding witness fees. First, Wexford is mistaken with respect to Perry, who did in fact testify. Second, witness fees are recoverable as long as the "witness's attendance was reasonably expected to be necessary, and if that witness was ready to testify." *Huerta v. Village of Carol Stream*,

No. 09 C 1492, 2013 WL 427140, at *4 (N.D. Ill. Feb. 4, 2013).  Hall argues that these witnesses were listed on his pretrial disclosures and that he intended to call them; Wexford has not shown otherwise.  Hall is entitled to the requested $433.52 in witness fees.

### Conclusion

For the foregoing reasons, the Court denies defendant Wexford's motion for judgment as a matter of law or a new trial [dkt. no. 220].  The Court grants plaintiff's motion for attorney's fees of $531,250 and also awards plaintiff costs in the amount of $20,508.05 [dkt. nos. 228, 229].

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  March 18, 2019

24